PRAVITA PRASAD NAIR

VERSUS

PASKARAN A. "PAZ" NAIR

NO. 24-CA-220

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 774-053, DIVISION "H"
HONORABLE DONALD L. FORET, JUDGE PRESIDING

December 20, 2024

**JOHN J. MOLAISON, JR.**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and John J. Molaison, Jr.

**VACATED IN PART; AFFIRMED IN PART; REMANDED**

    **JJM**
    **FHW**
    **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
PRAVITA NAIR
Laura J. Todaro

COUNSEL FOR DEFENDANT/APPELLEE,
PASKARAN A. "PAZ" NAIR
Cynthia A. De Luca
Marynell L. Piglia

**MOLAISON, J.**

The appellant, Pravita Prasad, the divorced wife of Paskaran A. "Paz" Nair, appeals the December 19, 2023 trial court judgment.[1] For the following reasons, we vacate the portion of the trial court judgment on the special master's fee, remand for setting the special master's fee, and affirm the judgment in all other respects.

## FACTS AND PROCEDURAL HISTORY

Pravita Prasad ("Ms. Prasad") and Paskaran Nair were married on January 27, 2001. At the time of the marriage, Ms. Prasad was 19, and Mr. Nair was 47. Two children were born of the marriage: Michael on January 27, 2004, and Michele on March 25, 2005.[2] On December 25, 2016, the parties began living separate and apart. On July 17, 2017, Ms. Prasad filed a Petition for Divorce, and on April 6, 2018, the court granted a divorce judgment.

On December 11, 2018, the parties entered into a consent judgment, which provided that the parties agree to "share custodial physical periods on a 7-day basis," with the exchange to occur on Fridays. The judgment stated that Ms. Prasad "shall" be responsible for the payment of Michael's expenses, and Mr. Nair "shall" be responsible for the payment of Michele's expenses. The judgment

---

[1] The matters that were tried by the district court on December 6, 2024 were: (1) Pravita Nair's Motion for Change of Custody and for Determination of Child Support Pursuant to Louisiana Statutory Guidelines, filed March 12, 2020; (2) Pravita Nair's Supplemental and Amended Motion for Change of Custody and Additional Rule Pursuant to R.S. 9:346 for Contempt of Court for Failure to Exercise Child Visitation, Custody or Time Rights, and Motion for Contempt of Court for Failure to pay Child Support/Tuition Obligation, filed October 7, 2020; (3) Pravita Nair's Objections to Proces Verbal by Special Master, filed April 6, 2023 and Motion to set for Hearing Before District Court Judge and Objection to Paz Nair's Ex Parte Attempt to have Court sign Order Adopting Special Master Report, filed April 20, 2023; (4) Paz Nair's Objection to Special Master's Report [of May 6, 2020, filed May 18, 2020 (dismissed by Paz at trial); (5) Paz Nair's Rule for Contempt and Motion to Modify Child Support, filed August 7, 2020; (6) Paz Nair's Motion and Order to Adopt the Proces Verbal of the Court Appointed Special Master as the Judgment of the Court, filed April 20, 2023; and (7) Paz Nair's Peremptory Exception of No Cause of Action and Motion to Dismiss [Pravita Nair's Objection to Special Master Report], filed June 22, 2023. The Court also considered the Special Master's request to be relieved and to be paid by the parties.

[2] Both children had attained the age of majority at the time of trial. Michael turned 18 on January 27, 2022 and Michele turned 18 on March 25, 2023. The motions/rules relate to the period between August/September 2019 through the dates on which each child graduated from high school after having attained the age of majority.

stated that the social security funds[3] received by Mr. Nair for Michael each month "shall" be transferred by Mr. Nair to Ms. Prasad via direct deposit into Ms. Prasad's Home Bank account ending in 2071.

On March 12, 2020, Ms. Prasad filed a motion for a change of custody and a determination of support according to the Louisiana statutory guidelines. She sought to increase the support based on her sole physical custody of both children since June 2019 and to have the increase made retroactive to the date of her original demand for support. She also sought to receive income tax benefits for supporting the children. On August 7, 2020, Mr. Nair filed a rule for contempt and a motion to modify child support. Mr. Nair sought to have Ms. Prasad held in contempt for violating the December 11, 2018 consent judgment and to change his child support obligation because he was no longer working. Mr. Nair retired and received $1,805.00 in social security benefits per month, rather than his prior monthly income of $8,000.00. He also alleged that Ms. Prasad's income had increased. On October 8, 2020, Ms. Prasad filed a motion for contempt, seeking to hold Mr. Nair in contempt for failing to exercise his visitation and pay expenses according to the December 11, 2018 consent judgment.

On April 6, 2023, the Special Master issued a *Proces Verbal* stating that: (1) Mr. Nair received social security payments of $12,840.00 on behalf of Michael, but Mr. Nair may be entitled to an offset based on Mr. Nair's motion to reduce support; (2) Mr. Nair was not voluntarily unemployed/underemployed; (3) Mr. Nair did not abandon his time with the children; (4) the support obligation of each parent based on each parent's income as shown from their tax returns; (5) Ms. Prasad owed reimbursement to Mr. Nair for claiming Michael as a dependent on her 2018 tax return; (6) new child support obligations should be calculated,

---

[3] The children began to receive social security payments when Mr. Nair retired and began collecting social security in 2018.

retroactive to August 7, 2020, making Ms. Prasad's claim for reimbursement of expenses she paid for Michele moot; and (7) that Ms. Prasad's motion for contempt was moot.

Mr. Nair filed a motion to adopt the *Proces Verbal,* and Ms. Prasad objected to the *Proces Verbal*.

On December 6, 2023, the trial court held a hearing on Ms. Prasad's objection to the *Proces Verbal*. On December 19, 2023, the trial court issued a written judgment denying Ms. Prasad's objection to the special master's *Proces Verbal*, denying Ms. Prasad's motion for change of custody and support and motion for contempt, and granting Mr. Nair's modification of child support. The judgment ordered that Mr. Nair owed Ms. Prasad $802.00, subject to a credit of $900.00. In addition, the judgment ordered that each party pay fifty percent of the special master's fees.

On January 9, 2024, Ms. Prasad filed a motion for a suspensive appeal of the December 19, 2023 judgment. After the court had set the appeal bond, Ms. Prasad failed to post it on time. This court has consistently held that when an appellant fails to post the suspensive appeal bond timely, the court will convert the appeal to a devolutive appeal if the appellant has satisfied the requirements for filing a devolutive appeal. *Parish of Jefferson v. Davis*, 97-1200 (La. App. 5 Cir. 6/30/98), 716 So. 2d 428, 432, *writ denied*, 98-2634 (La. 12/11/98), 730 So.2d 460. Ms. Prasad filed the suspensive appeal on time, and the appeal converted to a devolutive appeal when Ms. Prasad failed to post the appeal bond.

**LAW AND DISCUSSION**

On appeal, Ms. Prasad lists several assignments of error and objects to "virtually all of what could be considered to be 'findings of fact' in the trial court's 'reasons for judgment.'"

<u>Assignments of Error Regarding Custody (2 and 5)</u>

In these assignments of error, Ms. Prasad contends that the trial court erred by denying her motion for a change of custody, as she provided 100% of physical custody of the children from July 2019 until May 2023. She also contends that the trial court erred by denying her objection to the special master's *Proces Verbal*.

The testimony at trial indicates that Mr. Nair is from Malaysia and spent up to three months there every year from 2019 until 2022. He testified that he never spent more than three months at a time in Malaysia during that time period.

The December 11, 2018 consent judgment provided that the parties would pick the children up from school on alternating Fridays. According to Mr. Nair, however, beginning in the 2019 school year, Ms. Prasad broke "the rules of the agreement" by consistently picking up the children when it was Mr. Nair's turn to pick them up. Ms. Prasad admitted to only a few such occasions.

Mr. Nair testified that in the summer of 2019, he reluctantly allowed the children to go to Fiji[4] with Ms. Prasad. He was concerned that Ms. Prasad would not return to the United States with the children due to Fiji's lower cost of living.

According to Mr. Nair, Ms. Prasad alienated their kids from him when they returned from visiting her family in Fiji. On August 27, 2019, he requested that the kids be with him, but Ms. Prasad would not bring them. He repeatedly asked Ms. Prasad to "send the kids" to him, but she refused. Mr. Nair testified that he made every effort to see his children.

During the 2019-2020 school year, Mr. Nair went to Michele's school six or seven times to pay the bills and pick her up. But each time, she was not there. He attended Michele's induction into the honor society. Mr. Nair told Michele that he received mail for her regarding college scholarships, and Michele agreed to pick it up; however, she never did. He referred to a text message from Michele stating,

---

[4] Ms. Prasad is from Fiji.

"Mom doesn't want to bring me" to get the mail. The message said, "She won't listen how I need the mail because I have school stuff… but I will talk to her." Mr. Nair brought some of this mail to Michele. Mr. Nair testified that he had to obtain Ms. Prasad's new address from his attorney to send a Medicaid card for Michele to Ms. Prasad.

Mr. Nair admitted that on July 20, 2021, he wrote a text message to Michele telling her to tell her mother to send her to public school. He also wrote a text to Michele stating, "Remember, all monies earned over the years by your Dad are for you and your brother's education through college. The money is not for your mother to give to the boyfriend or girlfriends or impress her family or cousins, that is hard earned money by your Dad." Mr. Nair did not pay for Michele's senior ring or driving lessons.

Mr. Nair texted Ms. Prasad on May 11, 2022, asking about a ticket to Michele's graduation. According to Mr. Nair, Ms. Prasad received the tickets for Michele's graduation ten days before the graduation. He contends that Ms. Prasad mailed the tickets to him so that he "would not receive the tickets in time." In this same text message, Mr. Nair accused Ms. Prasad of alienating the children from him and "never return[ing] them on equal time" after their vacation in 2019. He referred to the "scene" Ms. Prasad made at school when it was his week with the children and reports of alleged abuse. The message stated that Ms. Prasad did not know the meaning of co-parenting and that she had broken the "rules of the agreement" and alienated the kids from him. He claimed that Ms. Prasad had "broke all clauses in the agreement," "did the damage," and had "never taken responsibility" for all she had done and is "still doing."

At the hearing, Mr. Nair denied ever abusing the children, although "social services" investigated him on two occasions for reports of abuse. He testified that he was "exonerated both times."

According to the evidence, before August 2019, Mr. Nair helped the children with homework and brought them to their activities. He elaborated that it was apparent from the text messages that he had a cordial relationship with the children before they went to Fiji. He took them to social events and brought them out to eat for their birthdays. He gave each child $100 for their birthdays and Christmas. Mr. Nair's testimony was corroborated by text messages between Mr. Nair and Michele in 2018, during which he checked on her homework, picked her up from school, and picked her up from the mall with friends. He spoke to the parents of her friends about her outings with friends. He also referred to text messages between him and Michael about picking up Michael and bringing him to activities; other messages referred to picking up food that Michael had requested.

Mr. Nair referred to an incident regarding Michael's band uniform in which Ms. Prasad told him to put Michael's band uniform in the mailbox so he could pick it up. Ms. Prasad then told Michael that Mr. Nair had thrown his uniform out, which resulted in Michael banging on Mr. Nair's front door and cracking the glass.

Mr. Nair admitted that the only communication he had with his children in 2020, 2021, 2022, and 2023 had been wishing them happy birthdays and holidays and encouraging them to get good grades. At the time of the trial, Mr. Nair had been communicating with Michele, who had been "really nice," but Michael had not replied to him.[5]

Ms. Prasad testified that in July 2019, both she and Mr. Nair had a week with the children, then she and the children went to Fiji. When they returned, the children refused to spend time with Mr. Nair, even though she told them it was his week. She emailed Mr. Nair, telling him the children refused to visit him and that

---

[5] At the conclusion of questioning of Mr. Nair by Ms. Prasad's counsel, the trial judge stated that he found Ms. Prasad did not carry her burden of proving that Mr. Nair "did not intentionally not see the children." When counsel for Ms. Prasad stated that she was not finished presenting her evidence on this issue, the trial judge said he would keep this issue open.

she could not force them to go. According to Ms. Prasad, the children continued to refuse to stay with Mr. Nair when it was his week.

Ms. Prasad acknowledged that the transfer of the children was supposed to take place at school, but she said she would have preferred if Mr. Nair had offered to come pick up the children when they refused to go with him. Mr. Nair never offered to come pick up the children. Ms. Prasad testified that Mr. Nair never called the children regularly. She stated that Mr. Nair never sent the children a birthday present or a Christmas gift in 2019, 2020, and 2021. Mr. Nair had no constructive communication with her regarding the children's best interests. She denied alienating the children from Mr. Nair and preventing Mr. Nair from seeing his children over the past three and a half years.

To Ms. Prasad's knowledge, Mr. Nair had not tried to see the children after 2020. She reminded the children when it was Mr. Nair's birthday and asked the children to let her know if they wanted to have lunch or dinner with Mr. Nair on their birthdays. She told the children they were welcome to go to Mr. Nair anytime they wanted to.

Ms. Prasad claimed that Mr. Nair did not want the children to go to Fiji because Michele had to attend summer school. They went to Fiji after Michele completed summer school.

Ms. Prasad referred to an email dated August 22, 2019, in which Mr. Nair stated that since the children got back from Fiji, Ms. Prasad had been brainwashing the children and not following the court order. Mr. Nair said, "Manipulating the kids is the wrong thing to do." Ms. Prasad emailed Mr. Nair on August 8, 2019, stating that the children asked if they could stay with her that week. In that message, Ms. Prasad noted that she would pay for their food while they were with her and not seek reimbursement. Ms. Prasad testified that in that email, she meant she would not seek reimbursement for that week. Ms. Prasad admitted to picking

the children up from school when it was Mr. Nair's week, but she said that occurred "maybe once or twice" … it was "not recurring."

Ms. Prasad went on to testify that Mr. Nair was abusive, that he was "very loud," and that he would "beat up" her and the children. She elaborated, "They were scared," and "he will scold them." Ms. Prasad said that when the children got in Mr. Nair's car, he would "start yelling and screaming and - - they were scared that he might beat them or like cuss them out and stuff like that." Ms. Prasad denied reporting Mr. Nair to social services. Ms. Prasad stated that Mr. Nair beat her when they were married, but she was afraid to say exactly "what happened" while she was married to Mr. Nair.

Ms. Prasad admitted that she moved and did not give Mr. Nair her new address, but claimed she did not know that Mr. Nair did not have her new address. When the hearing officer told her to, she gave Mr. Nair her new address. Ms. Prasad admitted that she changed her email address, but stated that she still had access to the old email address.

According to Ms. Prasad, Mr. Nair refused to pay the fees for Michele's graduation. As a result, she had to pay the fees, which caused a delay in getting the graduation tickets. She mailed a ticket to Mr. Nair on May 11, the day she picked them up. The graduation was May 13.

In this appeal, Ms. Prasad argues that the trial court erred when denying her motion for change of custody. On appellate review, the trial court's custody determination is entitled to great weight and will not be disturbed absent a clear showing of an abuse of discretion. *Barrett v. Barrett*, 20-266 (La. App. 5 Cir. 2/24/21), 314 So.3d 1023, 1039. An abuse of discretion generally results from a conclusion reached capriciously or arbitrarily, which means there is no rational basis for the action. *Boone Servs., LLC v. Clark Homes, Inc.*, 23-0299 (La. App. 1 Cir. 10/18/23), 377 So.3d 304, 311. A trial court's discretionary decision will not

be disturbed on appeal if reasonable people differ in the propriety of the trial court's ruling. Id.

The appropriate standard for appellate review of factual determinations is the manifest error standard, which precludes the setting aside of a trial court's factual findings unless they are clearly wrong in light of the record viewed in its entirety. *Reyes v. Clasing*, 13-791 (La. App. 5 Cir. 3/12/14), 138 So.3d 61, 64. A two-part test must be satisfied to reverse a fact finder's determination based on manifest error: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must also determine that the record establishes that the finding is clearly wrong. *Id.* On appeal, the issue before the appellate court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. *Jones v. Mkt. Basket Stores, Inc.*, 22-841 (La. 3/17/23), 359 So.3d 452, 463. The trial court is uniquely positioned to view and hear the witnesses' testimony. The appellate court may not merely decide whether it would have found the facts of the case differently and substitute its opinion for the trial court. *Reyes*, 138 So.3d at 64 (citing *Evans v. State Farm Mut. Auto. Ins. Co.*, 03-1003 (La. App. 5 Cir. 12/30/03), 865 So.2d 195, 197). Where there is a conflict in testimony, reasonable determinations of credibility and reasonable inferences of fact should not be disturbed on appeal. *Id.*

A review of the testimony by both parties indicates the record supports the trial court's decision to deny Ms. Prasad's motion for a change of custody. The testimony shows that Ms. Prasad repeatedly interfered with Mr. Nair's time with the children by picking them up from school when it was Mr. Nair's week with them and without informing Mr. Nair that she was doing so. The testimony and evidence further indicate that, before the summer of 2019, Mr. Nair had a close relationship with his children. He picked them up from school and extracurricular

activities, communicated with their friends' parents about outings, and brought them the requested food. Mr. Nair encouraged Michele to do her homework and explained the importance of doing well in school. Mr. Nair reluctantly allowed the children to go to Fiji with Ms. Prasad. He feared that after receiving substantial cash in the community property partition, Ms. Prasad would bring the children to Fiji and not return to the United States.

Both parties testified that after the children returned from Fiji to start the 2019-2020 school year, the children did not spend any time with Mr. Nair. Ms. Prasad claimed that the children did not want to visit Mr. Nair. On more than one occasion, Mr. Nair expressed concern that Ms. Prasad was "brainwashing" the children and turning them against him. In support of this concern, he highlights the incident in which Ms. Prasad had instructed Mr. Nair to place Michael's band uniform in the mailbox so she could bring Michael to pick it up, then told Michael that Mr. Nair had thrown the uniform outside.

Our role in reviewing the trial court's factual findings is not to re-weigh the evidence unless we determine it is manifestly erroneous because the record contains *no* support for its conclusions. As explained above, ample evidence in the record supports the trial court's denial of Ms. Prasad's motion for change of custody. The record supports the trial court's conclusion that Mr. Nair did not voluntarily choose to stop exercising the shared custody of his children as provided in the consent judgment of December 11, 2018. Likewise, the transcript and the evidence support the trial court's denial of Ms. Prasad's motion for contempt. For all of the preceding reasons, we conclude that the trial court did not err in denying Ms. Prasad's motion for change of custody and motion for contempt.

Assignments of Error Regarding Child Support (2, 3, 4, 5, and 7)

In these assignments of error, Ms. Prasad argues that the trial judge erred in determining child support according to the statutory guidelines and granting Mr.

Nair's motion to modify child support. Ms. Prasad contends that the trial judge

failed to find that Mr. Nair was voluntarily unemployed between July 2019[6] and

May 2023, when Michele graduated from high school. She reiterates that the trial

court erred when denying her objection to the special master's *Proces Verbal*.

Voluntarily unemployed

La. R.S. 9:315.11 provides in pertinent part:

> A. (1) If a party is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. In determining the party's income earning potential, the court may consider the most recently published Louisiana Occupational Employment Wage Survey. In determining whether to impute income to a party, the court's considerations shall include, to the extent known, all of the following:
> > (a) Assets owned or held by the party.
> > (b) Residence.
> > (c) Employment and earnings history.
> > (d) Job skills.
> > (e) Educational attainment.
> > (f) Literacy.
> > (g) Age and health.
> > (h) Criminal record and other employment barriers.
> > (i) Record of seeking work.
> > (j) The local job market.
> > (k) The availability of employers willing to hire the noncustodial parent.
> > (l) Prevailing earnings level in the local community.
> > (m) Other relevant background factors in the case.
> (2) Absent evidence of a party's actual income or income earning potential, there is a rebuttable presumption that the party can earn a weekly gross amount equal to thirty-two hours at a minimum wage, according to the laws of his state of domicile or federal law, whichever is higher.

In this case, there is no dispute that Mr. Nair lost his job in 2018. After that,

he began collecting his Social Security benefits, and the children received

Medicaid and Social Security income. At the hearing, the court accepted Bruce

Miller, an attorney and CPA, as an "expert."[7] On May 9, 2019, the court tasked

him with partitioning the community property, resulting in the *Proces Verbal* dated

---

[6] The record indicates that Mr. Nair stopped working in June of 2018.
[7] The transcript does not indicate the subject for which Mr. Miller was accepted as an expert.

May 6, 2020, stating his recommendations for the community property partition. The court again appointed Mr. Miller to assist with determining child support according to the statutory guidelines, resulting in the *Proces Verbal* filed on April 6, 2023. Mr. Miller testified that in determining support, he met extensively with counsel for both parties, explaining that the clients did not need to participate because he only had to determine the legal issue of support.

According to Mr. Miller, Mr. Nair was not voluntarily unemployed because he was fired. Mr. Miller testified that it would be difficult, if not impossible, for Mr. Nair to find a similar job. Mr. Miller made this determination based on his observations of Mr. Nair during the first set of special master hearings. Mr. Miller elaborated that he decided on the support obligation based on the facts and evidence presented to him; he did not speculate what Mr. Nair could have earned because he no longer has that earning capacity. Mr. Miller testified that there was no evidence that Mr. Nair was offered a job and rejected it. Mr. Miller received no vocational guidance or counseling service reports regarding Mr. Nair's income capacity.

During questioning by Ms. Prasad's attorney, Mr. Miller reviewed exhibits indicating that as of February 1, 2018, Mr. Nair's annual income was $156,482. On June 11, 2018, Mr. Nair's employer terminated him. In a meeting with the parties' attorneys, they discussed the issue of whether Mr. Nair could obtain employment at his advanced age. Mr. Miller testified that no case law holds that a 70-year-old has income attributed to them in the amount before their job termination. Ms. Prasad's counsel admitted to the trial judge that there are no cases in Louisiana about a father paying child support after the age 65. Mr. Miller testified that the parties did not provide evidence of any other employment opportunities for Mr. Nair, considering his age and physical condition. Mr. Miller

concluded that he had no evidence that Mr. Nair was voluntarily unemployed or underemployed.

In response to further questioning by Ms. Prasad's attorney as to why he would not impute Mr. Nair's prior income of $156,000 a year to determine support, Mr. Miller explained that he did not use the occupational employment rate as provided in the support statute because Mr. Nair was not voluntarily unemployed or underemployed. Mr. Miller pointed out that "under section G of the statute – age, and health – once a person gets a certain age, they are less employable." Mr. Miller elaborated that he had not received a vocational report stating that companies would employ Mr. Nair at specific salaries. In his research, Mr. Miller did not find any case law stating that a person in Mr. Nair's circumstance should have imputed income equal to their prior earnings in a support calculation.

Whether or not a person is voluntarily unemployed is a credibility determination made by the trial court. *Dugue v. Dugue*, 20-292 (La. App. 5 Cir. 3/24/21), 316 So.3d 170, 176. A trial court's factual determination based on the credibility of witnesses will not be disturbed on appeal absent a showing of manifest error. Id. The party claiming voluntary unemployment or underemployment is burdened to prove that fact. *Robeaux v. Robeaux*, 13-0404 (La. App. 4 Cir. 11/6/13), 129 So.3d 659, 667.

In this case, Mr. Miller testified that, in his expert opinion, Mr. Nair could not find a job as a CPA due to his advanced age and declining health. Further, medical records show Mr. Nair having chronic medical conditions, which Mr. Miller testified affected Mr. Nair's employability. Mr. Miller opined that due to Mr. Nair's advanced age, he could not impute the income of a CPA to Mr. Nair because of his unemployability. The evidence supports the trial court's finding that Mr. Nair was not voluntarily unemployed. For this reason, we find the trial

court did not abuse its discretion in determining that Mr. Nair was not voluntarily unemployed.

Calculation of support

Mr. Miller testified that Ms. Prasad's attorney had presented him with a worksheet stating that the combined family income was $13,250 per month, Mr. Nair owed 72% of support, and Ms. Prasad owed 28%. Mr. Miller did not accept that calculation because he could not find justification for these amounts. In that worksheet, Ms. Prasad's attorney had assumed that Mr. Nair could still earn his previous salary as a CPA before his discharge. Instead, Mr. Miller calculated support based on the parties' tax returns and the child support statute. Mr. Miller opined that Mr. Nair's age was a predominant factor in his inability to obtain a job similar to the one he held before being fired. For this reason, Mr. Miller made the support calculations based on Mr. Nair's income, as shown on his tax returns.

Mr. Miller disagreed with Ms. Prasad's attorney's alternative argument that the occupational guidelines for the salary of a CPA in Louisiana should be imputed to Mr. Nair because Mr. Nair's age and physical condition would preclude him from obtaining a job as a CPA. In response to further questioning by Ms. Prasad's attorney, Mr. Miller explained that he did not use the occupational employment rate because Mr. Nair was not voluntarily unemployed or underemployed. In his research, Mr. Miller did not find any case law stating that a person in Mr. Nair's circumstance should have imputed income equal to their prior earnings in a support calculation.

Mr. Miller spoke with Mr. Nair's attorney in Malaysia, who reported that Mr. Nair did not receive income from Malaysia. Mr. Miller explained that because Mr. Nair is a U.S. citizen, he must report his income on his tax return "wherever it's earned worldwide." In other words, IRS rules require citizens to include foreign income in their tax returns. Mr. Miller did not consider Mr. Nair's net

worth when calculating support because the child support statutes refer to income, not net worth. Mr. Miller did not consider assets owned or held by Mr. Nair in determining whether to impute income to him. In calculating support, Mr. Miller used Mr. Nair's actual income on his tax return, including his entire social security payment and interest income.

Mr. Miller assumed that the parties had 50/50 custody when he prepared the April 6, 2023 *Proces Verbal* because the December 11, 2018 consent judgment was still in place when Mr. Nair filed the motion to reduce child support on August 7, 2020. Mr. Miller knew that Mr. Nair was a CPA, had been terminated in June 2018, and that no case law has interpreted the child support statute requiring imputation of Mr. Nair's prior income, given his advanced age. For this reason, he calculated child support using the minimum wage. Mr. Nair's social security income was significantly more than the minimum wage, and Mr. Miller opined that the minimum wage calculation would not be appropriate.

Although Mr. Nair testified that he paid the support as provided in the December 11, 2018 consent judgment, he admitted not forwarding $12,840 in social security payments that he received on behalf of Michael. Mr. Nair testified that he transferred the monthly social security payments he received for Michael into Ms. Prasad's checking account as per the consent agreement on December 11, 2018. However, these payments stopped when Ms. Prasad closed the designated checking account without telling him. Ms. Prasad admitted that she had closed the checking account and had not given Mr. Nair a new checking account number. She claimed that Mr. Nair had never asked for the new account number. Ms. Prasad changed her email address and did not give Mr. Nair her new one, but she stated that she still had access to the old one.

The testimony indicates that Mr. Nair paid the expenses for Michele, although his last tuition payment was reimbursement to Ms. Prasad 18 months after

24-CA-220                                    15

she had paid the tuition.  Mr. Nair did not pay for Michele's senior ring or driving lessons.  Mr. Nair reimbursed Ms. Prasad for some expenses in taking Michele to Fiji.

Ms. Prasad admitted that the December 11, 2018 consent judgment provided that Mr. Nair would get the tax deduction for both children, but in 2018 she mistakenly took the tax deduction for Michael.

Ms. Prasad's 2019 income tax return shows an income of $121,682; that was the year she received a portion of Mr. Nair's retirement account as an advance of the division on the community property.  In the support calculation, Mr. Miller did not include the amount of cash Ms. Prasad received in the division of community property.

Mr. Miller testified that he terminated the special master hearings after several meetings because he could not get the parties to agree.  For this reason, he calculated child support using worksheet A, which is used when there is one primary or domiciliary parent, and worksheet B, which is used when parents share equal physical custody.  Mr. Miller opined that worksheet B should be used based on the December 11, 2018 consent judgment unless Mr. Nair "said he is not interested in seeing his children."  When Ms. Prasad's attorney questioned why he did not provide the worksheets, he said no one asked him to provide them.

Mr. Miller testified that in calculating support, he did not consider the social security income received by the children, stating that if he did so, he would have to increase both parties' incomes by the amount of the social security payments.  Mr. Miller explained that the amounts paid by social security are not child support.  Instead, child support is the money a parent pays for the support of their child.

Mr. Miller opined that the child support statute requires each parent to pay their share of the children's expenses.  If the family has a history of the children being in private school, the tuition is not an extraordinary expense for which he

would allocate an additional dollar amount. Mr. Miller testified that he did not give Mr. Nair credit for paying 100% of Michele's school tuition. If he did, Ms. Prasad would potentially owe Mr. Nair more money.

Mr. Miller opined that the expenses Ms. Prasad claimed she was owed for Michele were moot because he calculated child support based on the motion to reduce the support that Mr. Nair filed on August 7, 2020. He did not consider the expenses claimed by Ms. Prasad to be relevant because these expenses were subsumed in the guidelines amount. Mr. Miller elaborated that the additional expenses Ms. Prasad claims she paid for Michele are moot by applying the dollar amounts on the tables for income based on two children.

Mr. Miller testified that he considered that Michael had turned 18 but performed the child support obligation based on Michael's graduation from high school. Based on worksheet B, Mr. Miller concluded that Ms. Prasad got a credit of $12,840.00 for Michael's social security, and Mr. Nair got $12,038.00. The result is that Ms. Prasad owes Mr. Nair $98.

Mr. Miller testified that the August 7, 2020 motion to reduce child support filed by Mr. Nair has the effect of superseding the 2018 consent judgment based on Mr. Nair's change of circumstances. Mr. Miller explained that Mr. Nair showed a change in circumstance when he lost his job. Mr. Miller testified that the change in child support is retroactive to August 7, 2020, when the motion for change of support was filed.[8]

La. R.S. 9:315(C)(5) defines "income" as the "actual gross income of a party if the party is employed to full capacity" or "potential income of a party if the party is voluntarily unemployed or underemployed" to calculate a party's child support

---

[8] Ms. Prasad actually filed the first motion for child support on March 12, 2020. Mr. Nair's counsel pointed this out to the special master and the district court but no recalculation was requested or made to make the child support amounts retroactive to March 12, 2020 and no objection to the August 7, 2020 date was interposed by either party's counsel.

obligation. *State, Dep't of Soc. Ser., ex rel. S.McC. v. J.A.McC.*, 03-108 (La. App. 5 Cir. 5/28/03), 848 So.2d 121, 125. "A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party." La. R.S. 9:315 (C)(5)(b).

La. R.S. 9:315.9 provides that if each parent has physical custody of the child for an approximately equal time, the court should use worksheet B to calculate child support. There is no dispute that the December 11, 2018 consent judgment provided for shared custody. Mr. Miller testified that because the consent judgment providing for 50/50 shared custody when Mr. Nair filed his motion to reduce child support, worksheet B should be used to calculate the support obligation if no modification of custody was being granted. The trial judge adopted this calculation.[9]

La. R.S. 9:315 et seq. governs the guidelines to determine or modify child support. *Mize v. Mize*, 22-0094 (La. App. 1 Cir. 11/4/22), 355 So.3d 16, 19. The trial court has great discretion in establishing and modifying child support awards, and its judgment will not be disturbed on appeal absent a clear abuse of discretion. Id.

Having found that the trial court correctly denied Ms. Prasad's motion for change of custody and that Mr. Nair is not voluntarily unemployed, we find no error in the trial court's grant of Mr. Nair's motion to modify child support. Further, Mr. Miller testified that he calculated the child support based on the party's tax returns and guidelines for setting child support. Although Ms. Prasad claims the trial court erred in not having Mr. Miller provide the actual worksheets,

---

[9]Initially, the district court said that he was basing child support on Schedule A, but when Mr. Nair's attorney pointed out that the court had declined to modify custody, the district court changed course and acknowledged that Schedule B was the appropriate schedule under which to calculate child support in this case.

Mr. Miller testified that the parties did not ask for the worksheets. Ms. Prasad could have requested the worksheets from Mr. Miller, but she failed to do so. She did not object to Mr. Miller not providing the worksheets in the trial court, yet on appeal, she objected to the trial court not having the worksheets when he affirmed the special master's *Proces Verbal*.[10]

Further, although Ms. Prasad complains that the trial court failed to require Mr. Nair to provide his 2018 income tax return, the court calculated child support retroactively to the filing of Mr. Nair's motion to reduce child support filed on August 7, 2020. Thus, Mr. Nair's 2018 tax return was not relevant to the calculation of support.

The appellant is burdened on appeal to prove the error in the trial court's judgment. *Saacks v. Saacks*, 96-736 (La. App. 5 Cir. 1/28/97), 688 So.2d 673, 675. Mr. Miller gave detailed testimony as to how he calculated the support obligation. Counsel for Ms. Prasad cross-examined Mr. Miller extensively regarding the information used to calculate the support obligation. Mr. Miller explained in detail why he found that Mr. Nair was not voluntarily unemployed and how he arrived at the numbers in his *Proces Verbal*. The trial court accepted Mr. Miller as an expert and found his testimony credible.

As explained *supra*, the manifest error standard of appellate review precludes the setting aside of a trial court's factual findings unless these findings are clearly wrong based on the entire record. *Reyes*, supra, 138 So.3d at 64. The appellate court does not re-weigh the evidence when the record supports the trial court's findings. Having found ample support in the record for the trial court's determination that Mr. Nair was not voluntarily unemployed and the adoption of

[10] When questioned by counsel for Ms. Prasad regarding the worksheets, Mr. Miller testified that he "sent an email on July 12 -- which I copied both counsel as well -- with the calculation as to what A and B would be in terms of -- a credit towards Mr. Nair. And that's -- that was because, uh, Court was concerned that it didn't quite understand where the numbers fell. And so, I took the liberty of explaining that as sort of a supplemental analysis of -- of the numbers for the benefit of -- of those of you who'd be taking a look." This email is not contained in the appellate record.

Mr. Miller's child support calculations, we find that the trial court was not manifestly erroneous in denying Ms. Prasad's objection to the special master's *Proces Verbal*.

Special Master's Fees (assignment of error number 6)

The trial court ordered that Mr. Miller be relieved of his duties and that the costs of the special master be shared 50/50 by the parties. On appeal, Ms. Prasad argues that the trial court erred in "providing that each party be responsible for paying 50% of special Master Bruce Miller's fees."

La. R.S. 13:4165A allows the trial court to appoint a special master in any civil action in which "complicated legal or factual issues are presented." La. R.S. 13:4165D provides that the special master's compensation "shall be reasonable" and "fixed by the court." The appellate record does not contain any information regarding the amount of the special master's fee, nor is there any evidence that the court fixed the fee.

In addition, we find that the portion of the trial court judgment stating that each party pays 50% of the special master fee is not a valid final judgment. To constitute a valid final judgment, the relief granted must be determinable from the judgment so that a third person can determine the amount owed without reference to other documents. *Hill International, Inc. v. JTS Realty Corp.*, 21-0157 (La. App. 1 Cir. 12/30/21), 342 So.3d 322, 326. Where the amount of an award may only be ascertained by extrinsic reference, it is not a proper judgment. *Carter v. Carter*, 21-1173 (La. App. 1 Cir. 5/12/22), 342 So.3d 391, 394. In the absence of such decretal language, the ruling is not a valid final judgment, and in the absence of a valid final judgment, this Court lacks jurisdiction. *Id.*

For this reason, we vacate the portion of the December 19, 2023 judgment, ordering each party to pay 50% of the special master's fee. We remand this matter to the trial court to fix the special master's fee. Upon fixing the special master's

fee, we order the trial court to issue a valid final judgment concerning payment of the special master's fee.

## CONCLUSION

For the preceding reasons, we vacate the portion of the trial court judgment, ordering each party to pay 50% of the special master's fee and remand as instructed above.  We affirm the remainder of the trial court judgment.

**<u>VACATED IN PART; AFFIRMED IN PART; REMANDED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 20, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**24-CA-220**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE DONALD L. FORET (DISTRICT JUDGE)
LAURA J. TODARO (APPELLANT)

### MAILED
CYNTHIA A. DE LUCA (APPELLEE)
MARYNELL L. PIGLIA (APPELLEE)
ATTORNEY AT LAW
7037 CANAL BOULEVARD
SUITE 204
NEW ORLEANS, LA 70124